**COMMITTEE FOR EFFECTIVE CELLULAR RULES,**
Petitioner,

v.

**FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents,**

**BellSouth Corporation, et al., Intervenors.**

Nos. 93–1220, 93–1222, 93–1233.

United States Court of Appeals, District of Columbia Circuit.

Argued November 29, 1994.

Decided May 9, 1995.

Lewis J. Paper argued the cause, for petitioner Committee for Effective Cellular Rules.

William D. Silva argued the cause, for petitioners JAJ Cellular and McElroy Elec-

tronics Corp. With him on the briefs were Louis Gurman and Coleen M. Egan.

Roberta L. Cook, Counsel, F.C.C., argued the cause, for respondent. With her on the brief were William E. Kennard, General Counsel, Daniel M. Armstrong, Associate General Counsel, and John E. Ingle, Deputy Associate General Counsel, F.C.C., Anne K. Bingaman, Asst. Atty. Gen., Catherine G. O'Sullivan and Andrea Limmer, Attys., U.S. Dept. of Justice. Renee Licht, Counsel, F.C.C., entered an appearance.

Jim O. Llewellyn entered an appearance, for intervenor BellSouth Corp. Ray M. Senkowski entered an appearance, for intervenor McCaw Cellular Communications, Inc. Eliot J. Greenwald entered an appearance, for intervenor Syracuse Telephone Co. Leon T. Knauer entered an appearance, for intervenor US WEST NewVector Group, Inc.

Before: EDWARDS, Chief Judge, GINSBURG and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge TATEL.

TATEL, Circuit Judge:

Once again, we have before us a challenge to the Federal Communications Commission's regulations governing the licensing of cellular radio telephone service. In 1987, we sustained, in large part, the Commission's initial distribution of cellular licenses throughout the country. *See Maxcell Telecom Plus, Inc. v. FCC*, 815 F.2d 1551 (D.C.Cir.1987). Six years later, we directed the Commission to reinstate several applications for licenses to provide cellular service in areas that the existing licensees were not serving, i.e., the "unserved areas." *See McElroy Electronics Corp. v. FCC*, 990 F.2d 1351 (D.C.Cir.1993). The Commission had dismissed those applications because it had not yet established standards and procedures for awarding licenses for the unserved areas. The Commission has now established those standards and procedures through newly issued regulations. Among other things, these new regulations modify existing cellular licenses in a way that effectively increases the area covered by incumbent licensees, thus diminishing the area available to future licen-

sees. It is the latter consequence—the shrinking of the unserved areas—that has triggered this challenge to the Commission's cellular radio telephone regulatory scheme.

Petitioner, the Committee for Effective Cellular Rules, is an organization whose members are interested in filing applications for licenses to provide cellular service in unserved areas. We find that the Committee has associational standing to pursue this appeal, but we deny its petition for review. The FCC did not act arbitrarily and capriciously when it amended its regulations through a notice-and-comment rulemaking, nor did it exceed its statutory authority when it implemented a global change to the technical requirements for cellular licenses, even though that change resulted in the modification of all existing cellular licenses and significantly reduced the unserved areas that petitioner's members are interested in serving. We do not reach the challenges raised in consolidated cases by McElroy Electronics Corporation and JAJ Cellular, the same petitioners to whom we granted relief in *McElroy Electronics*, because the issues that they raise here are not yet ripe for review.

I.

The Commission licensed the first wave of cellular radio telephone systems in 1981. It divided the nation into urban and rural geographic markets, referred to as "metropolitan statistical areas" ("MSAs") and "rural service areas" ("RSAs"). The Commission established competing cellular systems within each market by dividing the cellular spectrum into two frequency blocks, allocating one block to a wireline carrier, such as the local telephone company, and the other to a non-wireline carrier. The Commission distributed these initial licenses through a streamlined competitive "paper hearing" or a lottery, depending on the size of the market.

To foster the rapid expansion of cellular service, the Commission created a simple and flexible regulatory system. Within any individual MSA or RSA, an applicant established the boundaries of its system by drawing the area it proposed to serve on a map of the market area. This delineated area, referred

to as the Cellular Geographic Service Area ("CGSA"), was identified simply as the area "defined by the applicant as the area intended to be served." 47 C.F.R. § 22.903(a) (1987). Once a cellular system was licensed, FCC rules protected its signal within the CGSA from electrical interference from the signals of other cellular systems. *See id.* § 22.903(b) (1987). With respect to MSAs, the Commission required only that each CGSA cover a minimum of 75% of the market and that the carrier provide reliable service to at least 75% of the territory within the CGSA that it proposed to serve. *See id.* The "reliability" of cellular service depends upon the strength of the radio signal, measured in terms of what are known as "dBus." The strength of the signal declines as the distance from the transmitter increases. In order to predict which areas of the CGSA would receive reliable service, the Commission instructed licensees to calculate their coverage according to a "39 dBu contour." This contour reflected the Commission's judgment regarding the point at which a cellular signal became too weak to provide reliable service. *See id.* §§ 22.903(c), 22.504 (1987). We sustained this general regulatory scheme in *Maxcell Telecom Plus,* 815 F.2d at 1556.

Consistent with its policy of encouraging the rapid and efficient expansion of cellular service, the Commission adopted new regulations in 1987 which permitted initial licensees to offer service to unserved areas in their markets without competition for five years after the grant of the first construction permit in each MSA. *See Amendment of Commission's Rules for Rural Cellular Service,* 2 F.C.C.R. 2306, 2308–09 (1987); 47 C.F.R. § 22.31(a)(1)(i) (1987). According to this so-called "five year fill-in policy," the Commission would not permit third parties to file applications for unserved areas until the five year period expired. *See* 47 C.F.R. § 22.31(a)(1)(i). This policy generally worked as the Commission anticipated: existing licensees expanded their systems by building more cell sites, thus providing service over a broader area. Cellular licensees continued to calculate the served areas on the basis of the 39 dBu contour.

In the early 1990s, the Commission entered the second phase of its effort to facilitate nationwide cellular service. In a rulemaking proceeding, it sought to identify the areas that remained without cellular service and to establish rules for awarding a second wave of cellular licenses for unserved areas. *See Amendment of Part 22 of the Commission's Rules to Provide for Filing and Processing of Applications for Unserved Areas in the Cellular Service and to Modify Other Cellular Rules, Notice of Proposed Rule Making,* 5 F.C.C.R. 1044, 1044, 1047–49 (1990). Recognizing that some existing licensees were probably not serving their entire CGSA—as we note above, the Commission had only required coverage of 75% of the CGSA—the Commission also proposed modifying existing CGSAs to make them coterminous with the 39 dBu contour, thereby limiting the incumbent's license to the area that it actually served. *Id.* at 1047.

After a period of notice and comment, the FCC issued its *First Report and Order,* defining an "unserved area," subject to a second wave of licensing, as an area outside an existing CGSA. *See Amendment of Part 22, First Report and Order and Memorandum Opinion and Order on Reconsideration,* 6 F.C.C.R. 6185, 6200–01 (1991). Because of virtually unanimous objection from commenters, the Commission did not redefine CGSAs as coterminous with a 39 dBu contour, as it had originally proposed. According to the commenters, the formula used to generate the 39 dBu contour calculated reliable signal strength based on outdated equipment and technological standards. *See Amendment to Part 22, Further Notice of Proposed Rulemaking,* 6 F.C.C.R. 6158, 6158 (1991); *Amendment to Part 22, Second Report and Order,* 7 F.C.C.R. 2449, 2452 n. 11 (1992). And most important for this case, the commenters argued that the 39 dBu contour underestimated the areas receiving reliable cellular service, claiming that a contour based on a weaker signal—that is, a contour further from the transmitter—would more accurately identify the areas receiving reliable service. *Further Notice of Proposed Rulemaking,* 6 F.C.C.R. at 6158.

The Commission responded to these concerns with a *Further Notice of Proposed Rulemaking,* inviting comments regarding a new method for determining the boundaries of CGSAs according to a lower signal strength. *Id.* at 6158–59. In the *Second Report and Order* that followed, the Commission adopted a new method for determining the CGSA of existing cellular license holders. It replaced the earlier system, in which the licensee delineated its own service area, with a mathematical formula that defined the CGSA in terms of areas actually receiving cellular service, and it lowered the required signal strength from 39 dBus to 32 dBus. *Second Report and Order,* 7 F.C.C.R. at 2452–54. According to the Commission, the application of this revised approach would be simple, objective and consistent. *Id.* at 2450; *see* 47 C.F.R. § 22.903(a) (1992). In order to avoid operating with two methods for determining CGSAs, the Commission modified the authorizations of existing cellular systems to redefine the boundaries of their CGSAs in accordance with these amendments. *Second Report and Order,* 7 F.C.C.R. at 2456. The amended rules became effective on July 16, 1992, 90 days after the publication of the *Second Report and Order. Id.*

These amendments had a significant impact. The Commission's recognition that reliable cellular service existed at a lower signal strength generally increased the size of the incumbent licensees' CGSAs, thus accomplishing the Commission's objective of rapidly and efficiently expanding cellular service. At the same time, the unserved areas available for licensing in the second wave contracted, thus stimulating this litigation.

In a petition for reconsideration of the Commission's rules, the Committee for Effective Cellular Rules, which had participated in the rulemaking and whose members wanted to obtain licenses for the unserved areas as they had existed before the current rulemaking, challenged the Commission's statutory authority to modify the licenses of existing cellular systems through a rulemaking, claiming that the Commission avoided the general adjudicatory process for modifying licenses in the Communications Act of 1934, 47 U.S.C. §§ 151 *et seq.* (1988 & Supp. V

1993). It also argued that the amendments were inconsistent with the Commission's old rules and prior assurances to third parties interested in filing applications for unserved areas. Denying the Committee's petition, the FCC ruled that it had the authority to promulgate rules of general application and that procedurally and substantively valid generic rules could properly modify existing licenses. *See Amendment of Part 22, Memorandum Opinion and Order on Reconsideration,* 8 F.C.C.R. 1363, 1364 (1993) (*"Reconsideration Order"*).

Several years earlier, even before the Commission began the rulemaking that culminated in the *Second Report and Order,* JAJ and McElroy filed unserved area applications for the Los Angeles and Phoenix markets. McElroy also applied for the Minneapolis–St. Paul market. Although McElroy and JAJ calculated that the five year fill-in period had expired in those markets, the Commission's Common Carrier Bureau dismissed their applications "without prejudice" because the Commission had not yet issued a date certain for filing or established the procedures for awarding licenses for the unserved areas. *Cellular Applications for Unserved Areas in MSAs/NECMAs,* 4 F.C.C.R. 3636, 3636–37 (Com.Car.Bur.1989). The Commission affirmed the Bureau. *First Report and Order,* 6 F.C.C.R. at 6190–92.

McElroy and JAJ petitioned this court for review of the Commission's dismissal of their applications. While those petitions were pending, the Commission issued its *Second Report and Order* in which it lowered the signal strength for measuring CGSAs from 39 to 32 dBus. Concerned that this action would adversely affect their license applications should they be reinstated by this court, McElroy and JAJ filed petitions for reconsideration of the *Second Report and Order* asking the Commission to exempt the unserved areas for which they had applied in Los Angeles, Phoenix and Minneapolis–St. Paul from the scope of the new regulations. The Commission denied their requests. *Reconsideration Order,* 8 F.C.C.R. at 1364.

Acting on McElroy and JAJ's pending petitions for review of the dismissal of their applications, this court subsequently instruct-

ed the Commission to reinstate those applications *nunc pro tunc. See McElroy Electronics,* 990 F.2d at 1367. We held that, although the Commission may have intended to postpone the filing of applications for unserved areas until it issued further notification of a date certain for filing, it had not made this clear when it issued the five year fill-in rules. *Id.* at 1353, 1363. We concluded that "even a careful reader of the order in question could not have been expected to understand that a further announcement by the Commission was a condition precedent to any applicant's filing of an unserved area application." *Id.* at 1353.

The Committee, JAJ and McElroy filed petitions in this court for review of the Commission's *Second Report and Order* and *Reconsideration Order.* The Committee argues, as it did before the Commission, that the agency exceeded its authority by modifying existing licenses in a rulemaking. McElroy and JAJ, whose applications the Commission has now reinstated, also argue that the Commission has impermissibly applied its new rules to them.

## II.

■ The FCC raises a threshold challenge to the Committee's standing to seek review of its orders before this court and argues that McElroy and JAJ's petitions are not ripe for review. With respect to the Committee, the FCC argues that it is not an "aggrieved" person who may seek judicial review of an agency action, *see* 5 U.S.C. § 702 (1988); 28 U.S.C. § 2344 (1988), emphasizing that an organization's participation in the rulemaking before an agency does not satisfy the requirements of standing. *See, e.g., American Legal Found. v. FCC,* 808 F.2d 84, 89 (D.C.Cir.1987). On the basis of the affidavits filed by members of the Committee, which have not been challenged by the FCC, we are satisfied that the Committee has standing to sue on behalf of its members.

■ An organization may sue on behalf of its members if it satisfies the three requirements of "associational standing." It must demonstrate that "its members would otherwise have standing to sue in their own right,"

that "the interests it seeks to protect are germane to the organization's purpose," and that "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977). The Committee clearly satisfies the second and third requirements of this test: its interest in overturning the Commission's new rules regarding the measurement of areas served by existing licensees certainly relates, or is "germane," to its organizational purpose "to maximize the opportunities for its members to file applications for Unserved Areas in existing cellular markets," Affidavit of Marcus K. Dalton, a founder of CECR, Reply Br., Addendum D; *see Humane Soc'y of the United States v. Hodel,* 840 F.2d 45, 56 (D.C.Cir.1988); and the claim made by the Committee and the relief that it seeks—respectively a broad facial challenge to the *Second Report and Order* and vacatur thereof—do not require the participation of individual members.

■ To satisfy the first requirement of the test, a member of the Committee would have standing to sue if he or she could demonstrate "actual or imminent" "injury-in-fact" that is "fairly traceable" to the challenged decision and "likely" to be "redressed by a favorable decision." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992) (internal quotation marks and citations omitted). Although no members of the Committee have yet filed applications for unserved areas, several have submitted affidavits stating their intention to do so if the Commission recreates the 39 dBu contour for CGSAs. Their inability to file applications to compete for the often larger and, thus, more profitable areas considered "unserved" under the old rules constitutes actual economic injury sufficient to establish "injury-in-fact." *See, e.g., Clarke v. Securities Indus. Ass'n,* 479 U.S. 388, 403, 397 & n. 13, 107 S.Ct. 750, 759, 756 & n. 13, 93 L.Ed.2d 757 (1987) (recognizing that alteration of competitive conditions has probable economic impact which satisfies "injury-in-fact" test); *FCC v. Sanders Bros. Radio Station,* 309 U.S. 470, 477, 60 S.Ct. 693, 698,

84 L.Ed. 869 (1940) (one "likely to be financially injured" by agency action has standing to challenge that action). This injury is clearly traceable to the *Second Report and Order,* which expanded the CGSA of existing cellular licenses, and reduced the areas considered "unserved." It is redressible by this court should we determine that the Commission acted beyond its authority.

We thus find that an individual member would have constitutional standing. In addition, the interest sought to be protected here, agency compliance with the statutory licensing procedures in the Communications Act, clearly falls within "the zone of interests," *Association of Data Processing Serv. Orgs., Inc. v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970), protected by that Act. *See United States v. Storer Broadcasting Co.,* 351 U.S. 192, 199–200, 76 S.Ct. 763, 768–69, 100 L.Ed. 1081 (1956) (petitioner "aggrieved" and has standing to challenge FCC rulemaking which limited concentration of stations under single control and, thus, rendered petitioner ineligible for additional licenses); *JEM Broadcasting Co. v. FCC,* 22 F.3d 320, 326 (D.C.Cir.1994) (holding that "actual or potential license applicants" would fall within class affected by FCC's "hard look" rules, as such they would be "aggrieved" within meaning of 28 U.S.C. § 2344, and thus they would have standing to challenge "procedural lineage" of such rules). Accordingly, the Committee has associational standing to maintain this appeal.

■ With respect to McElroy and JAJ's petitions for review, we agree with the Commission that the issues they raise are not "ripe." McElroy and JAJ claim that by denying their petitions to exclude the markets for which they had applied from the application of the new rules, the Commission impermissibly applied its new rules retroactively and violated their *Ashbacker* right to a competitive hearing. We do not read the FCC's rejection of McElroy and JAJ's petitions for reconsideration to resolve the issues that they now raise. First, this court had not ordered the reinstatement of their applications at the time the Commission issued the *Reconsideration Order,* so the agency had not addressed the matters that were subsequently remanded to it by the court. Second, since oral argument in this case, the Commission, acting in response to this court's ruling in *McElroy Electronics,* decided that petitioners could submit applications based on the old 39 dBu contour, although it also decided that other aspects of the new regulations would be applied retroactively. *See McElroy Electronics Corp., Memorandum Opinion and Order,* slip op. 8–13, 1995 WL 127206, —— F.C.C.R. —— (released March 23, 1995). Because the issues that McElroy and JAJ raised in their challenges to the *Reconsideration Order* were not resolved by the Commission until it issued its recent decision, and because that decision is not properly before us, we dismiss their petitions for review.

### III.

■ Turning to the merits of the Committee's petition for review, we begin by observing that it does not challenge the Commission's substantive determination that the lower signal strength of 32 dBu, calculated with the new mathematical formula, accurately identifies areas receiving reliable cellular service. Instead, the Committee argues that the FCC acted in an "arbitrary" and "capricious" manner, 5 U.S.C. § 706(2)(A) (1988), when it precluded the Committee's members from filing applications for the larger unserved areas under the old rules and that the Commission exceeded its statutory authority by modifying all existing cellular licenses to conform to its new 32 dBu formula through a rulemaking procedure. *See* 5 U.S.C. § 706(2)(C) (1988). We reject the Committee's challenges, holding that the FCC properly acted within its rulemaking authority when it amended the technical standards for determining reliable cellular service in the *Second Report and Order,* a change which resulted in the redefinition of the CGSAs of all existing cellular licensees. *See* 47 U.S.C. §§ 154(i), 303(r) (1988).

The Committee begins by contending that the Commission impermissibly departed from its own regulations regarding the filing of applications for unserved areas and disregarded its assurances to third parties that they would not be prejudiced by the agency's

postponement of the filing of unserved area applications. True, our *McElroy Electronics* decision found that the five year fill-in regulation gave no notice of the Commission's intention to engage in further proceedings and ruled that the petitioners could not be held to an interpretation of the regulation that the Commission "intended but did not adequately express." 990 F.2d at 1366 (citation omitted). *McElroy Electronics,* however, does not help the petitioner in this case because it did not preclude the Commission from changing its rules through a notice-and-comment rulemaking proceeding—as it did here—and because, unlike the petitioners in *McElroy Electronics,* the Committee and its members had adequate notice of the Commission's intention to issue new standards.

 We sustain the Commission's authority to change its standards in a rulemaking, as long as it provides a reasoned explanation for doing so. *See e.g., Florida Cellular Mobil Communications Corp. v. FCC,* 28 F.3d 191, 196–97 (D.C.Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1357, 131 L.Ed.2d 215 (1995) (affirming change in rules as reasoned response to Commission experience); *Rainbow Broadcasting Co. v. FCC,* 949 F.2d 405, 409 (D.C.Cir.1991) (emphasizing "wide latitude" afforded agencies to change their policies through rulemaking). This flexibility is necessary to allow agencies, particularly the FCC, to respond to rapidly changing "[t]echnological, commercial, and societal aspects of the ... industry" as they fulfill their delegated duties. *Rainbow Broadcasting,* 949 F.2d at 409. In this case, the Commission postponed the filing of applications for unserved areas in order to engage in a rulemaking to establish general rules for awarding unserved area licenses. The Commission also introduced the 32 dBu contour in response to industry comments that the 39 dBu contour underestimated the areas actually receiving reliable cellular service. Contrary to the Committee's assertions, then, this case is not like *New South Media Corp. v. FCC,* where we vacated a Commission order after determining that the Commission had impermissibly deviated from its rules with regard to a particular licensee. 685 F.2d 708, 718 (D.C.Cir.1982). Unlike this case, in which the Commission properly amended its existing rules, in *New South Media,* the Commission ignored them altogether by removing broadcast licenses about to expire from the competitive hearing procedures required for license renewal. *Id.* at 709–11, 715–16.

Nor did the Committee's members labor under the same confusion over the filing date for unserved area applications as McElroy, JAJ and the others whose applications this court ordered the Commission to reinstate *nunc pro tunc.* Common Carrier Bureau and Commission statements regarding those applicants gave the Committee and its members the adequate notice of the Commission's intention to postpone the acceptance of unserved area applications that we found missing in *McElroy Electronics.* Upon dismissing the "prematurely" filed applications, the Bureau indicated that the Commission would commence a rulemaking "to consider the appropriate processing and selection procedures, as well as substantive requirements, for applications proposing to serve any areas that remain unserved, either in MSAs or RSAs, at the termination of a particular market's fill-in period." *Cellular Applications for Unserved Areas in MSAs/NECMAs,* 4 F.C.C.R. at 3636. The Commission made the same point in its *Notice of Proposed Rulemaking* where it sought comment on the proposed rules regarding unserved area applications, stating that it had "determined not to accept applications to serve post-fill-in unserved areas until the completion of the instant Rule Making proceeding." 5 F.C.C.R. at 1045.

We find it difficult to understand exactly what the Committee thinks is "arbitrary" and "capricious" about this rather standard, if protracted, rulemaking. We have constantly admonished the Commission that " 'an applicant should not be placed in a position of going forward with an application without knowledge of requirements established by the Commission.' " *McElroy Electronics,* 990 F.2d at 1358 (quoting *Maxcell Telecom Plus,* 815 F.2d at 1558). Indeed, following the *First Report and Order,* the Committee itself, pointing out that the preparation of unserved area applications required the expenditure of substantial resources that would

be wasted if the Commission altered the technical requirements for unserved area applications, asked the Commission to defer setting the filing windows for unserved area applications until it completed its rulemaking. Any other result, in the words of the Committee, would be "like moving a race course while the horses are running." Pet. for Recons. of the *First Report and Order* at 16, Dec. 2, 1991, Joint Appendix at 219. The Commission's postponement of the acceptance of applications was thus both reasonable and generally beneficial to potential applicants, including petitioner's members.

We are not persuaded by the Committee's argument that it relied on the Common Carrier Bureau's assurance that it would permit McElroy, JAJ and the other dismissed applicants to reapply "without prejudice." *Cellular Applications for Unserved Areas in MSAs/NECMAs*, 4 F.C.C.R. at 3636. The Committee claims that its members understood "without prejudice" to imply that the Commission would not alter the substantive rules regarding the identification of unserved areas and, in particular, that the rights of third parties would not be diminished by the results of the rulemaking. We find it hard to believe that the Committee could read so much into a phrase that is commonly used only to denote that no bar exists to refiling an application at the appropriate time and in the appropriate manner. *See, e.g.,* 9 CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2367, at 319 (1995) (dismissal without prejudice in federal court "means that it permits the initiation of a second action"). We do not understand the Commission to have intended any other meaning. In fact, when the Common Carrier Bureau dismissed the applications for unserved areas "without prejudice," it specifically stated that the dismissed applicants could refile at a later date "in accordance with whatever substantive requirements and procedures the Commission ultimately adopts." *Cellular Applications for Unserved Areas in MSAs/NECMAs*, 4 F.C.C.R. at 3636. Echoing the Bureau, the Commission stated that "[b]ecause the applications were dismissed without prejudice, applicants have the right to refile their applications in accordance with the rules and proce-

dures we adopt today." *First Report and Order,* 6 F.C.C.R. at 6191. "[N]or," the Commission continued, "have the applicants been cut off from applying for any areas and frequencies for which they are eligible." *Id.*

The Commission properly changed the definition of CGSAs through notice-and-comment rulemaking. It acted clearly and reasonably when it postponed the acceptance of unserved area applications until it had determined the technical requirements for those applications. Since the Committee and its members had adequate notice of the Commission's intention to postpone the acceptance of filing unserved area applications until it had established the rules for accepting and processing those applications, the Commission's subsequent amendment of its rules was not arbitrary or capricious.

## IV.

■ Advancing a second, independent basis for vacating the *Second Report and Order,* the Committee argues that the Commission's decision to modify all existing licenses to conform to the new 32 dBu contour disregarded the adjudicatory procedures for license modification set forth in the Communications Act of 1934, 47 U.S.C. §§ 151 *et seq.,* and *Ashbacker Radio Corp. v. FCC,* 326 U.S. 327, 66 S.Ct. 148, 90 L.Ed. 108 (1945). It points out that incumbent licensees presented no applications for license modification, *see* 47 U.S.C. § 308(a) (1988), and that the Commission offered no opportunity for competitive hearing before modifying the licenses, *see id.* § 309(e) (1988). The Commission rested the modification of existing cellular licenses on its rulemaking authority, *see Second Report and Order,* 7 F.C.C.R. at 2458; *Reconsideration Order,* 8 F.C.C.R. at 1364; *Further Notice of Proposed Rulemaking,* 6 F.C.C.R. at 6158–59 & n. 7, but the Committee argues that the Commission improperly "established the licensee itself by rule."

■ Obviously, the FCC cannot, merely by invoking its rulemaking authority, avoid the adjudicatory procedures required for granting and modifying *individual* licenses. In *Aeronautical Radio, Inc. v. FCC,* for example, we rejected a Commission action

which "established the licensee itself by rule," language that the Committee now quotes in support of its position. 928 F.2d 428, 451 (D.C.Cir.1991). In that case, the Commission decided, through a rulemaking, to award a license to a consortium of qualified and interested applicants rather than selecting a single licensee. *Id.* at 436. We found that the Commission exceeded its rulemaking authority by requiring interested applicants to join a consortium and by denying them the opportunity to file individual competitive applications. *Id.* at 451–53.

But that is not what happened here. Unlike its actions in *Aeronautical Radio,* the Commission did not choose among contenders for a particular license in this rulemaking, but rather revised the technical specifications for *all* cellular licenses. In particular, the Commission adopted a new methodology that would more accurately reflect the areas where existing cellular systems provided reliable cellular service as well as those areas that remained unserved. Although it had begun the rulemaking with the apparent intention of continuing to use the 39 dBu contour, *see Notice of Proposed Rule Making,* 5 F.C.C.R. at 1047, extensive public comments convinced the Commission that the technology in the cellular industry had outpaced its 39 dBu contour method of calculation. Describing the 39 dBu contour as only an "interim measure," the Commission engaged the industry in a discussion of alternative methods to define reliable cellular service. *Further Notice of Proposed Rulemaking,* 6 F.C.C.R. at 6159. Its decision to adopt the 32 dBu formula reflects a policy decision that reliable service was available at a lower signal strength and that the mathematical formula provided a more reliable method for predicting areas served. This is precisely the type of decision appropriately made in a rulemaking. *See, .e.g., Telocator Network v. FCC,* 691 F.2d 525, 551 (D.C.Cir. 1982) (recognizing that Commission appropriately employs its rulemaking power when issues "involve legislative rather than adjudicative facts, and have prospective effect and classwide applicability." (footnotes omitted)).

The Commission's technical changes in the definition of the CGSAs, adopted in a notice-and-comment rulemaking, are not, as petitioner argues, invalid because they will result in the modification of existing licenses and the shrinking of unserved areas. This principle is neither new, *see American Airlines, Inc. v. Civil Aeronautics Board,* 359 F.2d 624 (D.C.Cir.), *cert. denied,* 385 U.S. 843, 87 S.Ct. 73, 17 L.Ed.2d 75 (1966), nor outdated, *see Upjohn Co. v. Food and Drug Admin.,* 811 F.2d 1583 (D.C.Cir.1987). In *WBEN, Inc. v. United States,* for example, the Second Circuit sustained Commission rules altering radio operations during the transitional presunrise period, even though these amendments resulted in the modification of all existing licenses. 396 F.2d 601, 617–18 (2nd Cir.), *cert. denied,* 393 U.S. 914, 89 S.Ct. 238, 21 L.Ed.2d 200 (1968). The court held that the FCC need not engage in evidentiary hearings required for modification of a particular license, explaining that "when … a new policy is based upon the general characteristics of an industry, rational decision is not furthered by requiring the agency to lose itself in an excursion into detail that too often obscures fundamental issues rather than clarifies them." *Id.* at 618. *See also California Citizens Band Ass'n v. United States,* 375 F.2d 43, 50–52 (9th Cir.), *cert. denied,* 389 U.S. 844, 88 S.Ct. 96, 19 L.Ed.2d 112 (1967) (sustaining proceeding that is rulemaking "in both form and effect" which resulted in modification of Class D radio station licenses by limiting their operation).

*WBEN* relied on this court's decision in *American Airlines Inc. v. Civil Aeronautics Board,* which rejected a challenge to a valid rulemaking proceeding that restricted passenger carriers' authorization to provide a certain type of air cargo transportation. 359 F.2d 624, 625–26 (D.C.Cir.), *cert. denied,* 385 U.S. 843, 87 S.Ct. 73, 17 L.Ed.2d 75 (1966). This change, in turn, arguably resulted in the modification of aviation certificates. *Id.* at 626, 628. Despite a provision in the Federal Aviation Act which required a hearing before modification of a particular certificate, *id.* at 628, we held that the Board's rulemaking authority "is not to be shackled … by importation of formalities developed for the adjudicatory process and basically unsuited for policy rule making," *id.* at 629.

Our review of the Commission's rulemaking in the instant case satisfies us that the Commission established a rule of general applicability when it lowered the required signal strength for cellular systems to 32 dBus in response to the technical developments in the cellular industry. As in *American Airlines*, we find "no individual action here masquerading as a general rule." *Id.* at 631.

■ It is because the Commission has this authority—to establish rules of general applicability, such as the technical requirements of licenses—that the Committee's argument that the Commission should have conducted individual adjudications under sections 308 and 309 before modifying existing cellular licenses fails. Those provisions govern a licensee's request for modification of a particular license. They do not deprive the Commission of its authority to pursue a rulemaking "necessary for the orderly conduct of its business." *Storer Broadcasting*, 351 U.S. at 202–03, 76 S.Ct. at 770.

The Committee argues however, that the Commission side-stepped the procedural requirements of sections 308 and 309 by "apparent[ly] rel[ying]" on section 309(c)(2)(A), 47 U.S.C. § 309(c)(2)(A) (1988), which exempts applications for "a minor change in the facilities of an authorized station" from the ordinary process for license modification. *Id.* The Committee uses the word "apparent" with good cause, for the Commission never mentions section 309(c)(2)(A) anywhere in its *Second Report and Order*. The Committee points to the phrase "*de minimis*" in a footnote in the *Second Report and Order*, claiming that this supports its argument that the Commission relied on section 309(c)(2)(A). *See Second Report and Order*, 7 F.C.C.R. at 2456 n. 35. Although the Commission does not directly respond to this argument, we do not read its reference to "*de minimis*" to refer to the expansion of existing licensees' CGSAs resulting from the change in signal strength from 39 to 32 dBus, but rather to the routine and relatively minor "*de minimis* extensions" of cellular systems that the Commission granted when incumbent licensees' signals reached areas just beyond their MSA boundaries and such extensions were necessary to provide reliable service within their MSAs. *See Reconsideration Order*, 8 F.C.C.R. at 1369. In the footnote to the *Second Report and Order* cited by the Committee, the FCC was indicating no more than that these *de minimis* extensions would remain valid, but would now be measured by the new 32 dBu standard. *See Second Report and Order*, 7 F.C.C.R. at 2456 n. 35. The Committee's suggestion that the Commission relied on section 309(c)(2)(A) for the authority to modify existing cellular licenses is thus without merit.

■ Nor, finally, are we persuaded by the Committee's argument that the Commission violated the command of *Ashbacker Radio Corp.*, which requires the FCC to treat mutually exclusive applications equally. 326 U.S. at 333, 66 S.Ct. at 151. *Ashbacker* rights are not triggered where, as here, no mutually exclusive applications are pending—the Committee's members had no applications for unserved areas pending when it challenged the Commission's rulemaking—and where the Commission, in a properly developed notice-and-comment rulemaking, makes a generally applicable change to the technical specifications of all cellular licenses. *Cf. Maxcell Telecom Plus*, 815 F.2d at 1561 (compliance with "cut-off procedure," designed to further "orderly administration," required before application considered "*bona fide*" and protected by *Ashbacker*); *Reuters Ltd. v. FCC*, 781 F.2d 946, 951 (D.C.Cir.1986) (*Ashbacker* "applies not to prospective applicants, but *only to parties whose applications have been declared mutually exclusive.*"). While the Commission's ultimate determination, that the lower 32 dBu signal strength accurately measured reliable cellular service, resulted in the reduction of the areas the Commission considered "unserved," it did not preclude members of the Committee and other potential applicants from applying for the newly defined "unserved" areas. It is this—the ability to compete on an equal basis—that is the essence of *Ashbacker*.

## V.

For the foregoing reasons, we deny the Committee's petition for review. The FCC properly engaged in notice-and-comment rulemaking to revise the technical standards

for determining those areas receiving reliable cellular service, and the resulting modification of existing cellular licenses to conform to the new standards fell well within its rulemaking authority. Because we find this authority sufficient, we need not address the Commission's argument that its power to modify existing licenses is also grounded in section 316 of the Communications Act. *See* 47 U.S.C. § 316 (1988). We do not reach the merits of McElroy and JAJ's petitions for review because we find the issues that they present were not resolved in the Commission orders before us today. Their petitions for review are dismissed.

*So ordered.*