**J. RODERICK MacARTHUR FOUNDATION and Lance E. Lindblom, Appellants,**

v.

**FEDERAL BUREAU OF INVESTIGATION, Appellee.**

No. 95–5386.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 9, 1996.

Decided Dec. 24, 1996.

Kate A. Martin, Washington, DC, argued the cause for appellants, with whom Harvey M. Grossman was on the briefs.

Freddi Lipstein, Senior Counsel, U.S. Department of Justice, Washington, DC, argued the cause for appellee, with whom Frank W. Hunger, Assistant Attorney General, Eric H. Holder, Jr., U.S. Attorney, and Leonard Schaitman, Attorney, U.S. Department of Justice, were on the brief.

Before: GINSBURG, RANDOLPH, and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge GINSBURG.

Opinion concurring in part and dissenting in part by Circuit Judge TATEL.

GINSBURG, Circuit Judge:

The J. Roderick MacArthur Foundation and its former president Lance E. Lindblom seek to compel the Federal Bureau of Investigation to expunge its records relating to their associational activities and to refrain from maintaining such records in the future. Lindblom invokes both the Privacy Act, 5 U.S.C. § 552a, and the First Amendment to the Constitution of the United States; the Foundation relies solely upon the first amendment.

Lindblom challenges only the FBI's retention of information about him, not its initial collection of that information. We hold that the Act does not forbid the Government from keeping information that it has lawfully collected and therefore we reject Lindblom's statutory claim. We decline to reach the appellants' first amendment claims because neither Lindblom nor the Foundation has standing to raise them. Accordingly, we affirm the order of the district court.

## I. Background

As president of the Foundation, which provides grants to organizations involved with various political, social, and economic issues, Lindblom occasionally met with foreign leaders and political dissidents. At some point Lindblom's associations caught the attention of the FBI. When Lindblom and the Foundation later got wind of the FBI's interest they asked the Bureau, pursuant to the Freedom of Information Act, 5 U.S.C. § 552(a), for copies of all documents it had relating to them. The FBI informed them that it had a file on Lindblom consisting of 23 pages of materials and that, although the FBI did not have a file on the Foundation, it had located in other files five pages on which the Foundation's name appears. (For the purposes of this case, the distinction between a "file" and the statutory term "record" is immaterial and we use the terms interchangeably.) The FBI released redacted copies of several of the documents relating to Lindblom and the Foundation but refused to release others, invoking exemptions 1, 2, 7(C), and 7(D) to the FOIA. At least some of the documents that the FBI released from the Lindblom file refer to Lindblom's associational activities.

Displeased by the nature of the material released and dissatisfied because other material was withheld, Lindblom and the Foundation sued the FBI in District Court claiming that the Bureau's conduct violates their rights under the FOIA and under the First,

Fifth, and Ninth Amendments to the Constitution of the United States. Lindblom also claimed that the FBI violated § (e)(7) of the Privacy Act, which forbids a government agency from maintaining records on an individual's first amendment activities unless the records are pertinent to and within the scope of an authorized law enforcement activity. In addition to monetary damages and an injunction, the parties asked the court to order the FBI to expunge its records concerning them and to refrain from maintaining any such records in the future.

After reviewing the documents *in camera*, the district court granted the FBI's motion for summary judgment. The court held that the documents were exempt from release under the FOIA and that the court's review of the documents had shown "that the investigation(s) referred to therein were not *of* the plaintiffs, but of others with whom the plaintiffs came into incidental (and, to appearances, innocent) contact." (Emphasis in original.)

## II. Analysis

On appeal, Lindblom and the Foundation have abandoned their claims under the FOIA and under the fifth and ninth amendments in favor of pursuing only their Privacy Act and first amendment claims. We begin by analyzing Lindblom's claim under the Privacy Act. We then turn to the appellants' separate efforts to demonstrate their standing to raise a first amendment claim.

### A. *The Privacy Act Claim*

■ Section (e)(7) of the Act provides in relevant part that a government agency "shall ... maintain no record describing how any individual exercises rights guaranteed by the First Amendment unless ... pertinent to and within the scope of an authorized law enforcement activity." 5 U.S.C. § 552a(e)(7). Section (a)(3) of the Act defines to "maintain" as to "collect, maintain, use [or] disseminate."

Lindblom does not challenge the FBI's having collected information about him, and we assume that the information was pertinent to an authorized law enforcement activity when it was collected. Lindblom's claim is that an agency may not maintain (that is,

retain) such lawfully collected information unless there is a current law enforcement necessity to do so. More specifically, he claims that "information which may have been properly collected as part of a legitimate law enforcement investigation may not be permanently kept under the name of the individual, especially when that individual is not the target of the investigation."

First, we note that the Act does not distinguish between the "target" of an investigation and any other subject (such as a crime victim) mentioned in the course thereof. Second, contrary to Lindblom's argument, the Act refers not to a "law enforcement investigation" but to an "authorized law enforcement activity." Materials may continue to be relevant to a law enforcement activity long after a particular investigation undertaken pursuant to that activity has been closed—of which more later. These points aside, Lindblom's primary assertion, that the Act forbids maintenance of information about first amendment activities unless that information serves a "current law enforcement necessity," requires more extended analysis.

Lindblom cites no authority for this proposition. We have not had occasion to consider it before, even in cases in which it seems obvious that the authorized law enforcement activity pursuant to which records were collected was of no current law enforcement interest, much less "necessity." *See Doe v. FBI*, 936 F.2d 1346, 1348, 1360–61 (D.C.Cir. 1991) (§ (e)(7) "permits an agency to maintain records describing" plaintiff's "political activities during the late 1960s and early 1970s"); *Nagel v. U.S. Dept. of Health, Educ. and Welfare*, 725 F.2d 1438, 1441–42 (D.C.Cir.1984) (maintenance of records describing exercise of first amendment rights by long-since fired employee does not violate § (e)(7) because records were compiled as part of effort to determine whether employee was adequately doing his job). Nor does a recent Seventh Circuit case upon which Lindblom lays great stress quite reach the issue before us: In *Becker v. IRS*, 34 F.3d 398, 408–09 (1994), the court held that the Privacy Act requires the IRS to remove from the appellants' files newspaper articles about tax protesters that neither named nor re-

ferred to the appellants. The court seemed to think that the lack of connection between the newspaper articles and the appellants was a reason for ordering the documents excised. 34 F.3d at 409. Yet if the articles did not relate to the appellants, we do not understand how the articles could qualify for expungement under § (e)(7) as records "describing how [the appellants] exercise[ ] rights guaranteed by the First Amendment." 5 U.S.C. § 552a(e)(7). At any rate, the court's analysis of § (e)(7) in *Becker* is neither clear nor compelling. The court set out to determine the meaning "of the 'law enforcement purposes' phrase of § 552a(e)(7)" not realizing that the phrase used in the Privacy Act is "authorized law enforcement activity." The court appears to have confused § 552a(e)(7) with § 552a(k)(2), which exempts from the requirements of the Act a system of records containing "investigatory material compiled for law enforcement purposes." The latter section, however, relates to the disclosure of material in an agency's files. It is not surprising that an agency must shoulder a greater burden in order to avoid merely disclosing law enforcement material than it must in order to avoid expunging such material. A record disclosed pursuant to the Privacy Act or the FOIA is not thereby made unavailable for use in future law enforcement activities. A record expunged pursuant to the Privacy Act, on the other hand, is a record gone forever. That the court in *Becker* confused the statutory standard is suggested also by its reliance upon *Voelker v. IRS,* 646 F.2d 332, 335 (8th Cir.1981), a case involving only the disclosure, not the expungement, of records under the Privacy Act.

Looking at the terms of § (e)(7), we find no support for Lindblom's argument that the Act authorizes an agency to maintain a record describing first amendment activities only if and so long as there is a "current law enforcement necessity" to do so. [Reply Br. 4] The noun "record" in § (e)(7) is modified in only two ways: the record must be "[1] pertinent to and [2] within the scope of an authorized law enforcement activity." We do not understand this to mean, as Lindblom would in essence require, that the record must be pertinent to an active investigation;

"an authorized law enforcement activity" such as foreign counter-intelligence, is a concept far broader than either an active investigation or a "current law enforcement necessity." Nor do we think that the provision, as written, can be read to require that the maintenance of a record, as opposed to the record itself, must be pertinent to an authorized law enforcement activity. One might argue that the Congress meant to say that an agency may "maintain no record relating to first amendment activities unless *doing so would be* pertinent to and within the scope of an authorized law enforcement activity." But the Congress did not say that, we are aware of no reason to think it meant to say that, and Lindblom does not so argue.

Lindblom tries to bolster his narrow interpretation of § (e)(7) by noting that the Act defines "maintain" to include "collect, maintain, use [and] disseminate," but substituting any or all of those verbs in § (e)(7) does nothing to change what the adjective "pertinent" modifies. Insofar as Lindblom suggests that information must be pertinent to a law enforcement activity not only when the agency collects the material but for as long as the agency maintains, and whenever it uses or disseminates, the information, the point is trivial. Information that was pertinent to an authorized law enforcement activity when collected does not later lose its pertinence to that activity simply because the information is not of current interest (let alone "necessity") to the agency—a point seemingly lost upon our dissenting colleague.

Finding little support in the text of § (e)(7), Lindblom resorts to legislative history for the argument that the purpose of that section is to prevent the harm that arises from the Government's continuing retention of records regarding an individual's first amendment activities. Lindblom relies upon the statement in Senate Report No. 1183, 93d Cong., 2d Sess. 57 (Sept. 26, 1974), that the Privacy Act is aimed at "preventing collection of protected information not immediately needed, about law-abiding Americans, on the off-chance that Government or the particular agency might possibly have to deal with them in the future." Even if the focus upon "collection" here did not tend to under-

mine rather than to support Lindblom's argument, this particular Senate Report would be of little value to an understanding of § (e)(7): The report accompanied a preliminary Senate bill that did not contain the provision before us. As the previous page in the Senate Report makes clear, the quoted statement pertains to § 201(7) of the Senate bill, which provides that "Each federal agency shall ... maintain no program for the purpose of collecting or maintaining information describing how individuals exercise rights guaranteed by the first amendment unless the head of the agency specifically determines that such program is required for the administration of a statute which the agency is charged with administering or implementing." S. 3418, 93d Cong. § 201(7) (1974).

Section (e)(7) in its present form was added as part of a compromise between inconsistent House and Senate bills, as explained in the "Analysis of House and Senate Compromise Amendments to the Federal Privacy Act":

> The Compromise broadens the House provisions application to all First Amendment rights and directs the prohibition against the maintenance of records. However, as in the House bill, it does permit the maintenance, use, collection or dissemination of these records which are expressly authorized by statute or the individual subject or are pertinent to a duly authorized law enforcement activity.

Cong. Rec., Dec. 17, 1974 (reprinted in *Legislative History of the Privacy Act of 1974, S. 3418 (Public Law 93–579): Source Book on Privacy,* 94th Cong., 2d Sess. 860).

One may draw two conclusions from this bit of history. First, Senate Report 93–1183, which was written some months before the Senate accepted the provision before us, does not reflect the intent of the Congress when it enacted § (e)(7). Second, such legislative history as does relate specifically to the provision before us does not support Lindblom's reading of the provision; indeed it tends to undermine his interpretation.

Besides lacking support in both the statutory text and the legislative history of § (e)(7), Lindblom's interpretation of the Act would place new and daunting burdens, both substantive and administrative, upon the FBI and other government agencies, with little or no gain to individual privacy. If a law enforcement agency were required to purge its files of information regarding an individual so requesting whenever it had closed a particular investigation, then its ability to accomplish its mission would inevitably suffer. As we have said before, intelligence gathering is "akin to the construction of a mosaic," *In re United States,* 872 F.2d 472, 475 (D.C.Cir. 1989); to appreciate the full import of a single piece may require the agency to take a broad view of the whole work. Suppose, for example, that a citizen is contacted by a foreign agent but the FBI, after investigation, determines that the contact is innocent. If the same individual is later contacted by another foreign agent and perhaps thereafter by a third, then what had earlier appeared to be innocent when viewed in isolation may, when later viewed as part of a larger whole, acquire a more sinister air. Simply put, information that was once collected as part of a now-closed investigation may yet play a role in a new or reopened investigation. If the earlier record had been purged, however, then the agency's later investigation could not be informed by the earlier event(s).

Furthermore, if federal law enforcement agencies were required upon request to purge all such records, then they would surely be inundated with requests to do so. Responding to each such request could be difficult and time-consuming. To determine whether information is pertinent to an authorized law enforcement activity as it is being collected is relatively easy; to determine whether there exists a "current law enforcement necessity" to retain the information may be far more difficult. The agency would have to inquire of all its local offices and the offices of all other investigatory agencies whether there is a current law enforcement necessity for a particular record. That would not be an impossible task, of course, but it would be a major one; we are reluctant to think that the Congress required so formidable an undertaking, with so little potential benefit, absent a clear statement to that effect.

Nor would reading § (e)(7) to forbid an agency from maintaining information properly collected in the course of a now-dormant investigation contribute appreciably to individual privacy. Section (b) of the Act, 5 U.S.C. § 552a(b), prevents an agency from disclosing information in its files to the public. *See Department of Defense v. FLRA*, 510 U.S. 487, 494, 114 S.Ct. 1006, 1011–12, 127 L.Ed.2d 325 (1994) (Privacy Act prohibits agency from disclosing employee addresses to collective-bargaining representatives). Indeed, a federal law enforcement agency (such as the FBI) may disclose information to another law enforcement agency (such as a local police department) only if the head of the latter agency has made a written request to the federal agency that maintains the record specifying the "particular portion" wanted and the authorized law enforcement activity for which it is wanted. § (b)(7). *See Doe v. DiGenova*, 779 F.2d 74, 92 (noting "rigorous requirements that Congress chose to impose on the disclosure process by means of the Privacy Act") (Starr, J., concurring in the judgment). To say that an agency may maintain such information, therefore, is not to say that it may disseminate it.

In this case, Lindblom particularly objects to the FBI's maintenance of the relevant records in a file retrievable by his name. Lindblom points to dicta in two cases suggesting that whether information is kept in an individual's file or in a general subject file may be a factor to consider in determining whether the agency must expunge a record. *Becker*, 34 F.3d at 398; *MacPherson v. IRS*, 803 F.2d 479, 485 n. 9 (9th Cir.1986). Neither case is apposite, however. *Becker*, as we have seen, involves material unrelated to the individuals in whose files it was being kept. *MacPherson* involves material on a particular individual being kept in a general "tax protestor" file. Neither case indicates that an agency may not maintain records relating to an individual under that individual's name.

Accordingly, we hold that the Privacy Act does not prohibit an agency from maintaining records about an individual's first amendment activities if the information was pertinent to an authorized law enforcement activi-

ty when the agency collected the information. The Act does not require an agency to expunge records when they are no longer pertinent to a current law enforcement activity.

 Lindblom also argues that the district court erred in denying his request for discovery. The district court has broad discretion to grant or deny a discovery request, and we will reverse such a decision only in unusual circumstances, *see SafeCard Services v. SEC*, 926 F.2d 1197, 1200 (D.C.Cir.1991), of which Lindblom points to none. The documents Lindblom sought in discovery were largely classified, and the district court's *in camera* review of those documents informed its decision that discovery was not necessary in order for the court to rule upon the Government's motion for summary judgment. In this, the district court did not abuse its discretion.

### B. *The First Amendment Claims*

The Foundation and Lindblom both claim that the FBI violated the first amendment by creating files on them based upon their associational activity. The FBI responds that it has no file on the Foundation and that its maintenance of lawfully gathered information about Lindblom does not violate his rights under the first amendment. We need not, however, decide whether the FBI violated the Constitution because the appellants lack standing so to claim.

 "In order to establish standing under Article III, a complainant must allege (1) a personal injury-in-fact that is (2) 'fairly traceable' to the defendant's conduct and (3) redressable by the relief requested." *Branton v. FCC*, 993 F.2d 906, 908 (D.C.Cir.1992) (quoting *Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315 at 3324–25, 82 L.Ed.2d 556 (1984)). The injury-in-fact requirement has two elements: The plaintiff must show that it has suffered "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992).

## 1. *The Foundation's Standing*

█ Consider first the case of the Foundation. It claims to have been injured because the FBI's maintenance of records on the Foundation inhibited its pursuit of activities protected by the first amendment. More specifically, the Foundation claims that the FBI's maintenance of records regarding the Foundation (1) may deter potential grantees from seeking money from the Foundation and (2) may make it more difficult for current Foundation employees to find jobs elsewhere in the future.

The Foundation attempts to substantiate its claims of injury by submitting the affidavits of Valerie S. Lies, President of the Donors Forum of Chicago, and Anne C. Hallett, Executive Director of the Wieboldt Foundation. The affiants declare, among other things, that "in the close-knit philanthropic community, an FBI file potentially limits the future employability of foundation personnel" and that "it is likely that some grantees' behavior will be affected by the maintenance of FBI files on foundations."

These affidavits speak broadly of stigma and harm to the Foundation's reputation. A "potential" limitation upon employees' future "employability" lacks concreteness. The Foundation points to not a single Foundation employee whose job prospects have been dimmed because of the FBI records. Nor does either affidavit indicate even generally how "some grantees' behavior will be affected" by the FBI records on the Foundation. The Foundation does not point to a single grantee or even type of grantee that would be any less likely to seek money from the Foundation because the FBI maintains records on it. This is not enough to establish an injury to the Foundation.

The Foundation's claim of injury also lacks immediacy. Because the Foundation does not allege that it has yet suffered any injury in the form of diminished job prospects for its employees or decreased interest from potential grantees, its only hope for standing rests upon showing that a threatened harm is *"certainly* impending." *Lujan,* 504 U.S. at 564 n. 2, 112 S.Ct. at 2138 n. 2 (emphasis in original). It is not enough for the Foundation to assert that it might suffer an injury in the future, or even that it is likely to suffer an injury at some unknown future time. Such "someday" injuries are insufficient. *Cf. id.* at 564, 112 S.Ct. at 2138.

The injury that a present Foundation employee might suffer when he is rebuffed by a prospective employer because the FBI maintains a file on the Foundation is speculative at best. The standing doctrine requires a greater degree of certainty that the party seeking relief from the court has a real interest at stake. *Compare SunCom Mobile & Data, Inc. v. FCC,* 87 F.3d 1386, 1388 (D.C.Cir.1996) (company that demonstrated only intent to purchase unidentified licenses sometime in future lacks standing to challenge FCC order applying to licensees) *with Committee for Effective Cellular Rules v. FCC,* 53 F.3d 1309, 1315–16 (D.C.Cir.1995) (individuals who would file applications for licenses if agency changed regulation have standing to challenge regulation).

The speculative nature of the Foundation's claim of injury is all the more apparent when one considers the claim *ex ante.* The purported injury depends upon the FBI's maintenance of a file on the Foundation being known to third parties. Yet the Foundation has not indicated how a reference to its name in the files of the FBI could become public knowledge unless the Foundation chose to make that information public—as the Foundation did here. Whatever injury the Foundation may suffer in the future appears to have been self-inflicted.[1]

---

1. We leave for another day the question whether, as Judge Tatel suggests, an organization concerned about the effect that information in its FBI file might have upon its first amendment activities would have standing to contest the maintenance of that information simply by alleging that "grant-seekers regularly submit FOIA requests for FBI files of grant-making institutions before applying to them." Opinion concurring in part and dissenting in part at 608–09. As this case illustrates, such a request would not likely be revealing because of the law enforcement exemptions to the FOIA. Perhaps if a foundation were to show that grant-seekers who make FOIA requests to the FBI thereafter refrain from seeking grants from that foundation—an ascertainable proposition because the foundation could itself use the FOIA to find out who has asked for its file—one might infer that the foundation is

## 2. Lindblom's Standing

■ Lindblom also raises a first amendment claim, but he offers no separate arguments or affidavits in support of his standing. Although Lindblom was the president of the Foundation when this litigation began, he left that position in 1994. (He is now a program officer in governance and public policy at the Ford Foundation.) Lindblom does not claim that the FBI's interest in him has limited or may limit his prospects for employment. Because Lindblom offers no separate argument or factual basis for his standing, we view his claim as derivative of the Foundation's claim; i.e., any harm to him is caused by harm to the Foundation of which he was president. Accordingly, because the Foundation lacks standing and Lindblom has failed to show that he has suffered any injury in his individual capacity, we hold that Lindblom lacks standing to press a constitutional claim against the FBI.

### III. Conclusion

Section (e)(7) of the Privacy Act does not by its terms require an agency to show that the information in its files relating to the first amendment activities of an individual is pertinent to a "currently" authorized law enforcement activity, and we find nothing in the structure or purpose of the Act that would suggest such a reading. Nor has either appellant alleged a sufficiently concrete and imminent injury to meet the constitutional requirements for standing to raise a first amendment claim. Accordingly, the judgment of the district court is

*Affirmed.*

TATEL, Circuit Judge, concurring in part and dissenting in part:

The court's observation that the word "pertinent" modifies only the noun "record" and its assumption that "law enforcement activity" includes activities ended long ago, lead it to conclude that the FBI may, consistent with section (e)(7), inventory information on the First Amendment activities of citizens for which the agency has no present, articulable use. Because I believe the court's

parsing of section (e)(7)'s language does not result in the best interpretation of that provision as a whole, I respectfully dissent from part II.A of the opinion.

The statute defines "maintain" as including both "maintain" and "collect." 5 U.S.C. § 552a(a)(3) (1994). To collect means "to gather together." To maintain means "to keep in existence or continuance; preserve." *Random House Unabridged Dictionary* 403, 1160 (2d ed.1993). In order to give each of these verbs its meaning, I would interpret section (e)(7), as a whole, to require that records be pertinent to "an authorized law enforcement activity"—words undefined in the statute—not only at the time of gathering, i.e., collecting, but also at the time of keeping, i.e., maintaining. In other words, if there is no *current* law enforcement activity to which a record has pertinence, the agency may not maintain it. Not only does this approach avoid effectively reading the word "maintain" out of that term's statutory definition, but it furthers the Act's purpose to protect citizens from the unnecessary collection *and* retention of personal information by the government.

Congress could have written section (e)(7) in either of two ways that would clearly give it the meaning my colleagues ascribe to it—that information pertinent to an authorized law enforcement activity when collected does not lose that pertinence over time. If the statute said that an agency shall "*collect* no record describing how any individual exercises rights guaranteed by the First Amendment . . . unless pertinent to and within the scope of an authorized law enforcement activity," I would agree that material need not be of continued pertinence for an agency to maintain it. Congress could have achieved the same result by requiring agencies to maintain no such record unless "*compiled for*, and within the scope of, an authorized law enforcement activity." But the statute does not read this way, and Congress knows how to use the words "collect" and "compiled for" without also meaning "maintain." *See* 5 U.S.C. §§ 552a(e)(2) (concerning collection of information), (j)(2)(A) ("information compiled for the purpose of identifying individual crim-

harmed by the disclosure of information in the agency's files.

inal offenders"), (k)(2) ("investigatory material compiled for law enforcement purposes"), (k)(5) ("investigatory material compiled solely for the purpose of" determining eligibility for military and federal civilian employment, federal contracts, or access to classified information). Because Congress chose to use the word "maintain" in section (e)(7), and to define that term as both "maintain" and "collect," we know that Congress must have meant something more than just "collect." *See Bailey v. United States,* — U.S. —, —, 116 S.Ct. 501, 507, 133 L.Ed.2d 472 (1995) (assuming that Congress uses multiple terms "because it intend[s] each term to have a particular, nonsuperfluous meaning").

Although Congress was clearly concerned about illegitimate collection of information regarding First Amendment activities, nothing in the legislative history indicates that Congress was not equally concerned, as the language of section (e)(7) indicates, with the maintenance of documents no longer pertinent to law enforcement activities. Indeed, the legislative history of the Privacy Act reveals congressional concern with *both* collection and retention of material. In describing the Act's purposes, the Senate Report recognizes collecting and maintaining files as separate activities, both deserving of careful scrutiny: "[The Act] is designed . . . for long-overdue evaluation of the needs of the Federal Government to acquire and retain personal information on Americans, by requiring stricter review within agencies of criteria for collection and retention." S.REP. No. 93–1183, at 2 (1974) 1974 U.S.C.C.A.N. 6916, 6917. Other sections of the Act carry out this purpose by requiring that records continue to be "accurate, relevant, timely and complete," 5 U.S.C. § 552a(d)(2)(B)(i); *id.* § (e)(5) (requiring agency to maintain records with "such accuracy, relevance, timeliness and completeness as is reasonably necessary to assure fairness"). In debating the law-enforcement amendment to section (e)(7), House members discussed only the "maintenance" of records; they did not even refer to collection. 120 Cong. Rec. 36,957 (1974).

In support of its interpretation of section (e)(7), the court cites a passage from the Conference Report which, other than ambig-uously stating that the "Compromise . . . directs the prohibition against the maintenance of records," merely reproduces the language of section (e)(7). Maj. Op. at 603–04. I am equally unpersuaded by the court's suggestion that because the Privacy Act limits the use of Lindblom's files, its interpretation of section (e)(7) presents no threat to personal privacy. Maj. Op. at 604. That Congress imposed limitations on dissemination of the information is not at all inconsistent with section (e)(7)'s command: the FBI may not "maintain [records] describing how any individual exercises rights guaranteed by the First Amendment . . . unless pertinent to and within the scope of an authorized law enforcement activity." Congress passed the Privacy Act to give individuals some defenses against governmental tendencies towards secrecy and "Big Brother" surveillance. *See* S. REP. No. 93–1183, at 1 (Privacy Act "is designed to prevent the kind of illegal, unwise, overbroad, investigation and record surveillance of law-abiding citizens produced in recent years from actions of some over-zealous investigators, and the curiosity of some government administrators, or the wrongful disclosure and use, in some cases, of personal files held by Federal agencies."). The fewer unnecessary files describing First Amendment activities the government keeps on law-abiding citizens, the lesser the chance of any future abuse of those files.

Turning to the MacArthur Foundation's First Amendment claim, I agree that the Foundation lacks standing, but for a narrower reason than the one set forth in section II.B.1 of the court's opinion. In my view, the Foundation lacks standing not because its claim of injury is too speculative, but because the Foundation has failed to establish the link by which the Bureau's actions would cause the alleged injury.

As the court notes, although asserting that potential grant-seekers might be reluctant to apply to the Foundation if they knew of the FBI records, the Foundation's affidavits suggest no mechanism by which such knowledge would be available. In fact, the mechanism is not very difficult to imagine: the existence of the Foundation's file should be readily ascertainable upon a proper FOIA request.

Yet the affidavits do not state that grant-seekers regularly submit FOIA requests for FBI files of grant-making institutions before applying to them. Had they done so, I believe the injury alleged here would not be unduly speculative. Otherwise, the Foundation would be unable to challenge the Bureau's retention of its files, because grant-seekers who would ferret out information on FBI files and therefore not apply to the MacArthur Foundation are hardly likely to come forward and state the reason they did not apply.

The MacArthur Foundation's alleged injuries are quite similar to the injuries the Supreme Court found adequate for standing in *Meese v. Keene*, 481 U.S. 465, 107 S.Ct. 1862, 95 L.Ed.2d 415 (1987). There, the Justice Department required the National Film Board of Canada to include a statement at the beginning of certain films indicating that they were political propaganda. *Id.* at 467–68, 107 S.Ct. at 1864–65. A member of a state legislature wishing to exhibit the films claimed that the required labeling would injure his reputation and his chances of reelection. *Id.* at 473, 107 S.Ct. at 1867–68. In support of these assertions he submitted several affidavits, including one describing the results of an opinion poll and another presenting the opinion of an "experienced political analyst" that the designation of material as political propaganda "stigmatizes those conveying it." *Id.* at 473–74 & n. 8, 107 S.Ct. at 1868 & n. 8. Like the affidavits in this case, they were uncontradicted. *Id.* at 474, 107 S.Ct. at 1868. Although the alleged injuries were clearly speculative and not necessarily fully provable even after the election, the Court held that they nevertheless sufficed to establish standing because they were " 'fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief.' " *Id.* at 476, 107 S.Ct. at 1869 (quoting *Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 3324–25, 82 L.Ed.2d 556 (1984)). Had the MacArthur Foundation alleged that grant-seekers customarily check the existence of FBI files, the same would be true here. The injury—grant-seekers choosing not to apply to the Foundation because of its FBI file—would be no more speculative than the injury alleged by Keene—that he would lose votes because he sponsored screenings of movies labeled political propaganda.